UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------ x
KELLY ANN JUNIOR, VICTORIA  :
OZERSKAYA, ANNA SANCHEZ, JOAN  :
STAMPER, AND ON BEHALF OF ALL  :
HOLDERS OF ENHANCED VOUCHERS  :
SIMILARLY SITUATED IN THE CITY  :
OF NEW YORK  :
                                                Plaintiffs,  :
     - against -  :       12 Civ. 3846 (PAC)
                                                                        :
THE CITY OF NEW YORK, HOUSING  :      OPINION & ORDER
PRESERVATION AND DEVELOPMENT  :
CORP., HOUSING URBAN  :
DEVELOPMENT, HUDSONVIEW  :
TERRACE, INC.  :
                                                Defendants.  :
------------------------------------------------------ x

USDC SNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: January 17, 2013

HONORABLE PAUL A. CROTTY, United States District Judge:

     The dispute here arises out of the conversion of a Mitchell-Lama[1] housing development, located on Tenth Avenue in what was formerly called "Hell's Kitchen" but now is renamed "Clinton," from its prior status as publically subsidized housing for moderate and middle income New Yorkers to unsubsidized, market rate housing. An owner is entitled to buy out of (voluntarily dissolve) the Mitchell-Lama program after the passage of time (twenty to thirty-five years) and the satisfaction of the subsidized mortgage. The conversion process has adverse impacts on the existing moderate and middle-income tenants who may no longer be able to

---

[1] The Mitchell-Lama program was enacted in the mid-50's and still provides affordable housing to many moderate and middle income New Yorkers. The program comes in three varieties: one administered by New York State, one administered by New York City, and one with shared administration by New York City and the U.S. Department of Housing and Urban Development. All three programs share certain common elements to achieve housing affordability: subsidization of low-interest mortgages and significant real property tax exemptions. Tenants have to meet income restrictions and the owner is guaranteed a fixed (but low) return on its investment. Upon dissolution (or buy out), the development is no longer subject to governmental regulation and may convert rents to market payments.

1

afford market rents. Such tenants may be insulated from the full impact of the market rate conversion by obtaining housing vouchers which provide them with rental assistance.

Vouchers come in two forms and give the existing tenants a choice: to leave their buildings or to stay. If they leave their current residence, tenants may obtain a regular Section 8 voucher (a move voucher), which limits their rent at the new location to 30% of their income. If tenants choose to remain in the converted development, they may obtain a Section 8 enhanced voucher (a sticky voucher), where a formula promulgated by the U.S. Department of Housing and Urban Development ("HUD") calculates the tenants' share of the rent and the share the government will pay the owner (landlord) to make up the balance of the rent.

Kelly Ann Junior, Victoria Ozerskaya, Anna Sanchez and Joan Stamper (collectively "Plaintiffs") are tenants who received Section 8 enhanced vouchers, or sticky vouchers. They bring this action against HUD, the City of New York ("City") and the New York City Department of Housing Preservation and Development ("HPD") (collectively, "City Defendants"), and Hudsonview Terrace, Inc. (the owner of the Mitchell-Lama development), alleging illegality in that the rent recertification process resulted in increased rents.

Plaintiffs assert four claims: (1) City Defendants violated Plaintiffs' due process rights by failing to conduct an evidentiary hearing in connection with their rent recertification; (2) HPD failed to inform Plaintiffs of the consequences of their participation in the Section 8 voucher program; (3) a declaratory judgment that HUD failed to properly supervise the City Defendants in the latter's administration of the voucher program; (4) against Hudsonview Terrace, Inc., the private landlord, seeking reformation of the lease agreement between the landlord and Plaintiffs. Hudsonview Terrace, Inc. has asserted a counterclaim against Plaintiff Kelly Ann Junior for $17,118.30 in past due rent. (Hudsonview Terrace, Inc. Answer ¶ 8, ECF No. 8.)

HUD moves to substitute the United States as the proper named defendant and then to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction and Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted. For the reasons set forth below, HUD's Rule 12(b)(1) motion is granted; and the Court does not reach the 12(b)(6) motion.

Plaintiffs and City Defendants cross-move for summary judgment. The Court grants summary judgment to Defendants on Count 1, the due process claim. In light of these dismissals, the Court declines to exercise supplemental jurisdiction over the remainder of Plaintiffs' claims against City Defendants and Hudsonview Terrace, Inc. (Counts 2 and 4).

## BACKGROUND

Plaintiffs reside at Hudsonview Terrace, located at 747-751 Tenth Avenue in New York (City Def. 56.1 ¶ 1), and have enjoyed the benefits of the Mitchell-Lama Program. (Am. Compl. ¶¶ 8-9.) Mitchell-Lama owners receive mortgage subsidies and real property tax exemptions in exchange for providing housing to moderate-and-middle-income families at affordable rents. (Id.) The Mitchell-Lama program provides that after the passage of a certain amount of time, property owners may pay off the mortgage, opt out of the program, and then raise rents to market rates. This privatization process is known as a "housing conversion action." (City Def. 56.1 ¶¶ 3, 5.) Existing tenants have a choice: they remain as tenants in the converted apartments and obtain "sticky vouchers" or they leave and obtain "move vouchers."

Under the Section 8 program, HUD contracts with local public housing authorities (PHAs) to monitor and administer the vouchers. (Am. Compl. ¶¶ 6, 7; 24 C.F.R. § 982.1.) The PHA for the City of New York is the New York City Department of Housing, Preservation and

Development. ("HPD").  (City Def. 56.1 ¶ 15.)  HPD's Administrative Plan[2] requires HPD to annually re-certify changes in tenants' family income and family composition.  (Ruiz Dec. Ex. C HPD Housing Choice Voucher Program Administrative Plan, ("HPD Administrative Plan") § 13.1.)  These recertifications may result in new family rental shares and correspondingly different housing assistance payments to the landlord.  Id.  Families are informed of these changes in a "rent breakdown letter."  Id.  In certain circumstances, tenants have the opportunity to request informal reviews, conferences, and informal hearings to "clarify, resolve, review, and appeal matters and decisions . . . ."  (Id. § 16.)

Hudsonview Terrace, Inc. is the owner of the apartment complex on Tenth Avenue, where Plaintiffs live.  (City Def. 56.1 ¶ 1.)  Hudsonview is a Mitchell-Lama housing development which converted to market rate on December 13, 2003.  (Am. Compl. ¶¶ 1-4, 9; City Def. 56.1 ¶ 7.)  All four named plaintiffs chose to remain tenants and chose Enhanced Vouchers to remain at their current locations.  (Am. Compl. ¶ 9; City Def. 56.1 ¶ 8.)  In 2011-12, Plaintiffs went through the annual recertification of their rent, which resulted in rent calculations which took significant portions of their incomes.  (Am. Compl. ¶¶ 1-4.)

At the time of the conversion action, all four Plaintiffs were paying the enhanced voucher minimum rent in accordance with a schedule set by HUD's Rent Order—this was a fixed dollar amount depending on the number of bedrooms and the location of the apartment in the complex. (Ruiz Dec. ¶¶ 23, 29, 33, 38; Ex. A.)  At some point, three of the four Plaintiffs, Junior, Ozerskaya, and Sanchez, experienced a significant decrease in their incomes, which triggered a shift in the method used to calculate their shares, allowing them to pay less than the enhanced voucher minimum rent.  Their new share became the percentage of income that the Plaintiffs

---

[2] Under 24 C.F.R. § 982.54(a), HPD must adopt an Administrative Plan establishing local policies for administration of the program.  The Plan must conform to HUD's regulations and HPD is bound by its Plan.  24 C.F.R. §§ 982.54(b), (c).

paid for rent at the effective date of the conversion. (Id. ¶¶ 24, 30, 35.) This percentage continued to bind Junior, Ozerskaya, and Sanchez in each subsequent rent recertification. When Junior's and Sanchez's incomes subsequently increased rather drastically (Ozerskaya's income increased less drastically),[3] this resulted in their paying a greater dollar amount than the enhanced voucher minimum rent that they paid at the time of the conversion. (Id. ¶¶ 26-27, 35-36.) Plaintiff Stamper never experienced the significant decline that triggered the shift calculation that form the basis of the other Plaintiffs' grievances; she continues to pay the enhanced voucher minimum rent. (Id. ¶ 38.) Plaintiffs' shares now constitute between 40% and 60% of their incomes.[4] In response to HPD's rent-breakdown letter, notifying the Plaintiffs their new shares, three of the Plaintiffs wrote letters to the HPD contesting their 2012 recertifications. (Id. ¶¶ 28, 32, 37, Ex. E, G, I.) HPD replied by letter, explaining the basis for its calculations. (Id. Ex. F, H.)

## DISCUSSION

### I. HUD's Motion to Dismiss

1. Substituting the United States as Defendant

In Count 3, Plaintiffs "seek a declaration to the effect that HUD has been negligent in its training and supervision of [HPD] and [the City] . . . ." (Am. Compl. ¶ 32.) HUD argues that claims asserting negligent supervision and training against a federal agency are tort actions subject to the Federal Tort Claims Act, 28 U.S.C §§ 1346(b), 1402(b), 2401(b), and 2671-2680 (the "FTCA") and therefore the United States is the proper defendant. (Def. Br. at 1-2.)

---

[3] The rent breakdown letters in the exhibits that Plaintiffs filed in state court reflect slight increases in Ozerskaya's share from 2006 to 2012, from $284 to $437. (Ex. E.)

[4] The percentages that Plaintiffs allege in their Amended Complaint, ranging from 40% to 75% contain a flawed comparison—they compare Plaintiffs' current shares in 2012 to their 2010 annual income. Plaintiffs and the City Defendants dispute the percentages at which some of the Plaintiffs are locked in (Junior 56.1 Counterstatement ¶ 7; Junior Aff. ¶¶ 10, 13, 14), but this dispute is irrelevant to Plaintiffs' due process and failure-to-supervise claims.

5

Even though Plaintiffs do not specifically invoke the FTCA, claims asserting negligent supervision against a federal agency have been construed as tort actions analyzed under the FTCA.  See, e.g., United States v. Gaubert, 499 U.S. 315, 318-19 (1991) (reviewing claim asserting the negligent supervision of a savings and loan association by federal regulators under the FTCA); K.P.M. Corp. v. U.S. Dep't of Hous. & Urban Dev., Civ. A. 86-4089, 1987 WL 16039, at *3 (E.D. Pa. 1987) (finding that Plaintiff's claim against HUD fell under the FTCA because "claims for monetary damages against an administrative agency which sound in tort are cognizable exclusively under the FTCA.").  There is no reason not to treat Plaintiffs' negligent supervision claim as a tort claim to which the FTCA would apply.[5]  Plaintiffs argue that their reference to HUD's conduct as "negligent" in the complaint was "by error," (P. Opp. at 2) but this does not change the fact that the underlying conduct is HUD's negligent supervision of HPD, which sounds in tort.  (Am. Compl. ¶ 32.)

"The FTCA . . . precludes tort suits against federal agencies.  The only proper federal institutional defendant in such an action is the United States."  Rivera v. United States, 928 F.2d 592, 609 (2d Cir. 1991) (citing 28 U.S.C. § 2679(a)); C.P. Chem. Co. v. United States, 810 F.2d 34, 37 n.1 (2d Cir. 1987).  28 U.S.C. § 2679(a) provides that "[t]he authority of any federal agency to sue and be sued in its own name shall not be construed to authorize suits against such federal agency on claims which are cognizable under section 1346(b) of this title, and the

---

[5] Contrary to Plaintiffs' assertion, it is not relevant that they seek declaratory, as opposed to monetary relief. (P. Opp. at 5.) The FTCA is the exclusive remedy for tort claims against the United States, and its waiver only extends to monetary relief. This suggests that immunity applies and declaratory relief is unavailable. See Diaz-Bernal v. Meyers, 758 F. Supp. 2d 106, 117-118 (D. Conn. 2010) (collecting cases and concluding that declaratory relief is not available under the FTCA); Beale v. DOJ, 99 A.F.T.R.2d (RIA) 888, 2007 U.S. Dist. LEXIS 6837, at *20 (D.J. 2007) ("[T]his Court would have no jurisdiction under the FTCA to grant injunctive or declaratory relief on tort claims. Instead, Plaintiffs' exclusive remedy against the government for tort violations, and monetary damages are the only permitted remedy under the FTCA.").

remedies provided by this title in such cases shall be exclusive."  Here, under the FTCA, the United States, rather than HUD the federal agency, is the proper defendant.

2. Motion to Dismiss for Lack of Subject Matter Jurisdiction

The United States may not be sued without its consent.  The FTCA "constitutes a limited waiver by the United States of its sovereign immunity."  Millares Guiraldes de Tineo v. United States, 137 F.3d 715, 719 (2d Cir. 1998).  "The [FTCA's] limitations foreclose suit unless the tort claimant has previously presented to the appropriate administrative agency a claim that meets the specific statutory requirements as to its form, content, and timing."  Id. (citing 28 U.S.C. § 2675(a)).[6]

A failure to comply with this exhaustion requirement deprives the court of subject matter jurisdiction to hear the claim.  Wyler v. United States, 725 F.2d 156, 159 (2d Cir. 1983). Plaintiffs do not assert that they satisfied the FTCA's administrative exhaustion requirement by presenting their claims to HUD.[7]  Instead, Plaintiffs urge the Court to use its equitable powers under Article 3 to "dispense" with the need for exhaustion.  (P. Opp. at 4-7.)  There is no cognizable basis for the Court to do so.[8]  See Glover v. United States, 111 F. Supp. 2d 190, 192 (E.D.N.Y. 2000) (noting that the FTCA's exhaustion requirement is to be strictly construed).

---

[6] "An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, *unless the claimant shall have first presented the claim to the appropriate Federal agency* . . . ." (emphasis added).  28 U.S.C. § 2675(a).

[7] It appears that no presentation was made.  Miniard Culpepper, HUD's Regional Counsel for the New England Region and person responsible for supervising the review and processing of all FTCA claims filed against HUD, indicated that after a search of office records, no claims were found for any of the named Plaintiffs or on behalf of any City "holders of enhanced vouchers."  (Declaration of Miniard Culpepper ("Culpepper Decl."), ¶¶ 2-3.) Plaintiffs do not question this statement.

[8] Plaintiffs' reference to Bowen v. City of New York, 476 U.S. 467 (1986) does not support their argument that "equity stands ready to bypass procedural obstacles" in this case.  (P. Opp. at 4.)  In Bowen, the Supreme Court decided to waive a statutory exhaustion requirement contained in the Social Security Act, 42 U.S.C. § 405(g), pursuant to criteria that the Supreme Court articulated for that particular provision in Mathews v. Eldridge, 424 U.S. 319 (1976).

Plaintiffs refer to 5 U.S.C. § 702, and claim that they have a cause of action permitting judicial review under the Administrative Procedure Act (the "APA"). (P. Opp. at 5.) This argument is misplaced for a number of reasons. Plaintiffs do not plead this claim in their Amended Complaint. The first suggestion of the APA's applicability arises in Plaintiffs' opposition to the motion to dismiss. The Amended Complaint is also devoid of any facts that could give rise to judicial review under the APA, including a description of the "final agency action" to be reviewed, or explanation of the "legal wrong" suffered or ways in which they were "adversely affected or aggrieved" by HUD's violation of a statute. See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 882 (1990). "New facts and allegations, first raised in a Plaintiff's opposition papers, may not be considered" in deciding a motion to dismiss. Simone v. United States, No. 09 Civ. 3904, 2012 WL 4891617, at *6 (E.D.N.Y. Oct. 9, 2012) (citations omitted); see Friedl v. City of New York, 210 F.3d 79, 83-84 (2d Cir. 2000). Here, the Court cannot consider any APA claim that Plaintiffs have not raised in their complaint.

More fundamentally, Section 702 of the APA does not waive sovereign immunity for Plaintiffs' negligent supervision claim. See Diaz-Bernal v. Meyers, 758 F. Supp. 2d 106, 119 (D. Conn. 2010) ("[T]he APA does not waive sovereign immunity for declaratory relief in conjunction with the FTCA . . . ."). Section 702, when it applies, "waives sovereign immunity in 'nonstatutory' review of agency action under [28 U.S.C. § 1331] . . . This jurisdictional route pursuant to sections 1331 and 702 may not be used, however, if 'any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'" See United States v. Nicolet, No. 85-3060, 1986 U.S. Dist. LEXIS 15795 (E.D. Pa. 1986), at *9 (quoting 5 U.S.C. §

702(2)).[9]  The FTCA prohibits suit here because its waiver of immunity extends only to monetary, and not injunctive or declaratory, relief.  Id.; accord Beale v. DOJ, 2007 U.S. Dist. 6837, at *19 (D. N.J. 2007) (noting that Section 702 of the APA cannot waive immunity from claims statutorily derived from the FTCA).[10]  Therefore, the APA does not apply.

The Court grants Defendant's Fed. R. Civ. P. 12(b)(1) motion to dismiss Plaintiffs' claim for lack of subject matter jurisdiction, and does not reach Defendant's arguments for dismissal, pursuant to Fed. R. Civ. P. 12(b)(6).[11]

**II. City Defendants' and Plaintiffs' Cross-Motions for Summary Judgment on the Due Process Claim**

1. Standard of Review

Summary judgment may be granted where "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is material if it "might affect the outcome of the suit under governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The moving party bears the initial burden of producing evidence on each material element of its claim or defense demonstrating that it is entitled to

---

[9] Subsection (2) provides: "Nothing herein . . . confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought."

[10] Plaintiffs may be suggesting in their opposition papers that the Court has supplemental jurisdiction to adjudicate their claim against HUD based on its federal question jurisdiction over Plaintiffs' due process claim against HPD for failing to conduct a hearing pursuant to 24 C.F.R. 982.555(a).  (P. Opp. 11-12; Am. Compl. ¶¶ 13-16.)  This argument is meritless.  Jurisdictional statutes do not waive the United States' sovereign immunity.  See Doe v. Civiletti, 635 F.2d 88, 94 (2d Cir. 1980) (Section 1331); Ireland v. Suffolk County of New York, 242 F. Supp. 2d 178, 192-93 (E.D.N.Y. 2003) (Section 1367).

[11] The United States contends that they were never formally served with a copy of the Summons and Verified Complaint that Plaintiffs filed in New York Supreme Court on April 13, 2012, but instead received a copy from Plaintiffs' counsel by facsimile on July 17, 2012.  (Tinio Dec. ¶¶ 3-4; Ex. B.)  Defendant argues this defect in service violates Fed. R. Civ. P. 4(i)(1) and/or 4(i)(2) and warrants dismissing Plaintiffs' claim.  (D. Br. at 11.)  Some courts have dismissed cases for defects in service.  E.g., Olusi v. Keisler, 2008 WL 3539891 (S.D.N.Y. 2008).  The Court need not reach that question here, however, because the Court lacks subject matter jurisdiction over claims against HUD and the United States.

relief.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim."  Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995).

2. The "Hearings" Claim

Plaintiffs maintain that under 24 C.F.R. § 982.555(a), HPD was required to conduct an evidentiary hearing for Plaintiffs to present evidence of their economic hardship prior re-certifying Plaintiffs' rent to require a "substantial increase in their portion . . . which will . . . become permanent."  (Am. Compl. ¶¶ 13, 15; P. Opp. at 6-7.)  They allege that this omission violated their right to due process under the Fourteenth Amendment.  (Am. Compl. ¶ 16.)[12]  City Defendants respond that HPD had no discretion to lower tenants' rents based on economic hardship under HUD's rules and regulations, which mandate the formula for calculating the amount owed by tenants participating in the Enhanced Voucher program.  (D. Br. at 2-4.)  The Court grants summary judgment to City Defendants.

HPD did not violate 24 C.F.R. § 982.555(a).  HUD's regulations for implementation of the Section 8 Voucher program require the PHA to provide an opportunity for an informal hearing with participating tenant-families in certain situations.  See 24 C.F.R. § 982.555(a)(1); see also Ruiz Dec. Ex. C, HPD Administrative Plan § 16.3.1.  These hearing procedures mirror the procedures that the Supreme Court held in Goldberg v. Kelly were necessary to comport with constitutional requirements.  Falkowski v. Northfork Hous. Alliance, Inc., 2009 U.S. Dist. LEXIS 92573, at *14-15 (E.D.N.Y. 2009).  Section 982.555(a)(1) provides:

---

[12] The Court will interpret this to mean a denial of their procedural due process rights.

> "[A] PHA must give a participant family an opportunity for an informal hearing to consider whether the following PHA decisions relating to the individual circumstances of a participant family are in accordance with the law, HUD regulations and PHA policies"

It only applies to certain enumerated circumstances, none of which are relevant here. See 24 C.F.R. § 982.555(a)(1)(i)-(iv) (requiring hearing for (i) "[a] determination of the family's annual or adjusted income, and the use of such income to compute the housing assistance payment[,]" (ii) appropriate utility allowance, (iii) family unit size, (iv) whether a family is residing in a unit with a larger number of bedrooms than appropriate for a family of that size, (v) terminating assistance based on a family's actions or failure to act, and (vi) terminating assistance based on a family's prolonged absence from the assisted unit."). HPD's Administrative Plan provides for an informal hearing in these circumstances. (Ruiz Dec. Ex. C, § 16.3.1.) Plaintiffs do not contend that they sought a hearing to contest HPD's finding of their annual or adjusted income, or the use of such income to calculate the rental subsidy. (C.F.R. § 982.555(a)(1)(i); Ruiz Dec. Ex. C, HPD Administrative Plan § 16.3.1.) Instead, Plaintiffs argue that they should have been given the opportunity to present evidence of their "hardship" prior to any re-certification that would have "substantially increase[d] . . . their portion of the rent." (Am. Compl. ¶¶ 13, 15, 16.) The regulations do not require a hardship hearing.

"The Due Process Clause does not protect against all deprivations of constitutionally protected interests in life, liberty, or property, 'only against deprivations without due process of law.'" Rios v. Town of Huntington Hous. Auth., 853 F. Supp. 2d 330, 337 (E.D.N.Y. 2012) (citing Parratt v. Taylor, 451 U.S. 527, 537 (1981)). "To determine whether the Plaintiff has a valid due process claim, the Court applies a two-step inquiry: (1) whether the Plaintiff posses a liberty or property interest and, if so, (2) what process is due before she can be deprived of that interest." Id. (citing Ciambriello v. Cnty. of Nassau, 292 F.3d 307, 313 (2d Cir. 2002)).

Plaintiffs' due process claim fails at the first step of this analysis because they have not identified any entitlement to a protected property interest. "Property interests . . . are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . ." Board of Regents v. Roth, 408 U.S. 564, 577 (1972). It is well established that Section 8 tenants have a property interest in continuing to receive assistance payments. Rios, 853 F. Supp. 2d at 338 (collecting cases). A termination of these payments or voucher holders' participation the program constitutes a deprivation that would entitle them to procedural safeguards. Rivera, 2012 U.S. Dist. LEXIS 74267, at *10-11. Here, however, unlike most Section 8 cases in which courts have found the existence of a protected property interest, Plaintiffs' assistance payments were not terminated. Instead, Plaintiffs' complaint appears to be that HPD's practice of requiring Plaintiffs to pay a larger share of rent, relative to their income, is unfair. But the statute that governs the Housing Choice Voucher Program explicitly creates a permissible ceiling as to tenants' rental shares (after a significant decline in their income), which HPD followed. 42 U.S.C. § 1437(f)(t)(1)(D) provides: [I]f the income of the assisted family declines to a significant extent, the percentage of income paid by the family for rent shall not exceed the greater of 30 percent *or the percentage of income paid at the time of the eligibility event for the project*." Further, HUD's program directive, HUD Notice PIH 2001-41(HA), prescribes the formula for calculating participating tenants' shares, which HPD also followed. HPD's Administrative plan did not expand on these entitlements—it prescribes the same methods of calculation mentioned in the statute and program directives. (Ruiz Dec. Ex. C, HPD Administrative Plan, § 19.3.1.) In essence, Plaintiffs are not arguing that they were deprived of a benefit guaranteed to them by statute or any other source, but that the entitlement did not

adequately address their needs. This is insufficient to constitute a property interest for due process purposes.

Further, any hearing that HPD would have held with Plaintiffs would have been futile because HUD did not give HPD the discretion to lower Plaintiffs' rents based on their economic circumstances. Plaintiffs' assertions to the contrary do not create a genuine issue of material fact. First, by statute, HPD does not have discretion to allow tenants to pay less rent under the enhanced voucher program than they did at the date of the conversion action. See 42 U.S.C. § 1437(f)(t)(1)(A): "the assisted family shall pay as rent no less than the amount the family was paying on the date of the eligibility event for the project in which the family was residing on such date." In addition, HPD is required to follow HUD's requirements, which are issued as regulations, Federal Register notices, and program directives. 24 C.F.R. 982.52(a). One such directive, HUD Public Indian Housing Notice number 2001-41(HA), prescribes the formula for calculating Enhanced Voucher holders' rental shares. This share must be "the greatest" of: (1) 30 percent of adjusted family income; (2) 10 percent of family monthly income; (3) the welfare rent; (4) the enhanced voucher minimum rent;[13] or (5) such other minimum rent established by the PHA. (Ruiz Dec. Ex. D, HUD Notice PIH 2001-41(HA), Page 33.) This amount does not change, unless tenants experience a "significant decline in family income," which HUD defines as "a decrease . . . of at least 15 percent from the . . . income on the date of the [housing conversion]," id. at 31, in which case the "enhanced voucher minimum rent" described in the five-part formula becomes the higher of (1) "the percentage of monthly adjusted income the . . . family share represented on the effective date of the [conversion]" or (2) "30 percent of the family's current adjusted monthly income." Id. at 32. The HUD program directives also provide

---

[13] As mentioned previously, this is a dollar amount set by HUD's Rent Order based on number of bedrooms and location of apartment in the complex. (Ruiz Dec. Ex. A.)

that once the change in the "enhanced voucher minimum rent" becomes effective, it permanently binds the tenants into the future: "the enhanced voucher minimum rent for the family remains that specific percentage of income (e.g., 32 percent) and will not revert to a specific dollar amount, even if the family income subsequently increases or decreases."  Id.   HPD's Administrative Plan lays out the same methods of calculating tenant shares, and similarly states that in the event of a significant decrease in income, the aforementioned percentage of adjusted income "will remain as the family's enhanced voucher minimum rent regardless of subsequent changes in income." (Ruiz Dec. Ex. C, HPD Administrative Plan, § 19.3.1.)  HPD does not have the discretion in this process to elect among the five options enumerated in HUD Notice PIH 2001-41(HA), or to choose between the two criteria that confront voucher holders who experience a "significant decline" in their income.  In both situations, HPD is required to apply the highest or higher of the enumerated criteria.  Even if family income subsequently increases, a circumstance that HUD's program directives and HPD's Administrative Plan expressly contemplate, HPD may not revert to the method of calculation used prior to the date of the "significant decline" in income, e.g., either a specific dollar amount or a percentage, under the five-part formula.  Plaintiffs have not identified any provision that would permit HPD to consider tenants' individual circumstances or deviate from HUD's statutory or regulatory formula.[14]  Instead, they assert that "whichever method HPD applies in calculation it is going to result in . . . a different share of the . . . rent" paid by Plaintiffs. (P. Opp. at 3, 7.)  Plaintiffs assert that this gives rise to a due process violation because they were "never heard as to what method of calculation is used for the certification."  (P. Br. at 7.)  Plaintiffs are mistaken.  Where

---

[14] Plaintiffs have not challenged the validity of HUD's rules or regulations in the Amended Complaint.  Plaintiffs instead allude to their unfairness and contend, without support, that it is a "manifest injustice" for participants to be required to pay more than 30% of their income in rent. (P. Opp. to HUD SJ at 8; P. Opp. to City SJ at 1-2.)  This is insufficient to support a challenge to HUD's regulations.

HPD does not have the discretion to elect among alternatives, any hearing about the method used would not have made a difference to Plaintiffs' rent payments. See Augusta v. Cmty. Dev. Corp., 2008 U.S. Dist. LEXIS 103911, at *19 n.15 (E.D.N.Y. 2008) (holding that there was no denial of due process arising from failure to hold a hearing where plaintiff's benefits were terminated on grounds that did not require a hearing under HUD's regulations).

Plaintiffs' examples of discretion are unrelated to the calculations that HPD undertook as part of the rent recertification process. The HAP agreement (between Hudsonview Terrance, Inc. and HPD) allows HPD to make rent reasonableness determinations. (P. Opp. at 5-6; Katz Dec. ¶¶ 4-8, 18.) These determinations refer to the contract rent charged by the landlord of a Section 8 assisted unit, not the rental amount that the voucher holder must contribute. (Pl. Ex. B, HAP Contract Part B, ¶ 6; Notice PIH 2001-41(HA).) HPD's ultimate assessment of contract rent is irrelevant to the share that Section 8 tenants are expected to pay, because none of calculations for tenants' shares under HUD's directives are measured in relation to contract rent. (Ruiz Dec. Ex. D, Notice PIH 2001-41(HA), Page 33.) Even if tenants experience a "significant decline" in income, the formula shifts to require a certain percentage of their income, which remains unrelated to contract rent.

When HPD reviews landlords' rent increase requests, HPD requires the landlords to provide written submissions. (Pl. Ex. B, HAP Agreement, Part B §6(d).) Plaintiffs assert that they are entitled to a hearing to "examine the landlord's submissions" or to dispute HPD's rent reasonableness determinations. (Katz Dec. ¶ 8.) This argument is meritless. Plaintiffs do not identify any provision of HPD's Administrative Plan or HUD's regulations that requires landlords to make their submissions to HPD available to Enhanced Voucher holders. The HAP Agreement allows HPD and HUD to inspect the landlords' records, id. § 11, but does not vest

similar rights in voucher holders, see id. Part C, Tenancy Addendum. At any rate, Plaintiffs have not shown that HPD's rent reasonableness determinations have any bearing on their rental payments.

Plaintiffs point to a disparity in the rent paid between Section 8-assisted and unassisted units at Hudsonview Terrace. They also allege that this difference in treatment is codified in the Settlement Agreement executed between Hudsonview Terrace, Inc. and the Tenants' Association. (P. Opp. at 3-4, 8-9; Katz Dec. at ¶ 11.) In particular, non-voucher tenants who experience a decline in income are only required to pay the lower of 30% of their annual gross income or 80% of market rent, while Enhanced Voucher holders are subject to HUD's formula, which in certain circumstances, requires them to pay more than 30% of their adjusted income. (Katz Dec. Ex. D, ¶¶ 10-12.) Plaintiffs have failed to demonstrate how the amount that non-voucher tenants pay for rent is relevant to Plaintiffs' shares as voucher holders. It would therefore be futile to permit a hearing for Plaintiffs to present evidence of such differences as part of Plaintiffs' challenge of their own rental shares.[15]

### III. Plaintiffs' Remaining Claims

Under 28 U.S.C. § 1367(c)(3), a court may decline to exercise supplemental jurisdiction over related claims when it has "dismissed all claims over which it has original jurisdiction." Here, the Court has dismissed the only claims over which it has federal jurisdiction—Plaintiffs' negligent supervision claim against the United States, and claim against City Defendants alleging a violation of 24 C.F.R. § 982.555(a) and Due Process under the Fourteenth Amendment. The Court declines to exercise jurisdiction over Plaintiffs' remaining claim against the City

---

[15] Plaintiffs cite as another example of HPD's discretion in the tenant-share re-certification process, Section 15.7 of the HPD's Administrative Plan, which gives HPD the discretion to "deny program admission or terminate assistance because of action or failure to act by members of the family." As Plaintiffs' assistance payments were never terminated, this provision does not apply to Plaintiffs. (Katz Dec. at ¶ 19.)

Defendants for alleged failures to inform Plaintiffs about the details of the Section 8 program; against Hudsonview Terrace, Inc. for reformation of their lease; and the latter's counterclaim against Plaintiffs.  These claims may be amenable to state court jurisdiction.

Plaintiffs' Amended Complaint and submissions are ambiguous, but to the extent that Plaintiffs are contesting HPD's rent calculations for the 2012 recertification, an Article 78 proceeding in New York State Supreme Court may be appropriate. [16]

## CONCLUSION

The Court grants HUD's motion to dismiss, grants City Defendants summary judgment on the due process claim, and remands Plaintiffs' remaining claims to New York State Supreme Court.

Dated: New York, New York
       January 17, 2013

SO ORDERED

_____
PAUL A. CROTTY
United States District Judge

---

[16] Article 78's four-month limitations period bars Plaintiffs' challenges to HPD's rent calculations for recertification periods prior to 2012.  CPLR § 217(1).

Defendants for alleged failures to inform Plaintiffs about the details of the Section 8 program; against Hudsonview Terrace, Inc. for reformation of their lease; and the latter's counterclaim against Plaintiffs. These claims may be amenable to state court jurisdiction.

Plaintiffs' Amended Complaint and submissions are ambiguous, but to the extent that Plaintiffs are contesting HPD's rent calculations for the 2012 recertification, an Article 78 proceeding in New York State Supreme Court may be appropriate.[16]

## CONCLUSION

The Court grants HUD's motion to dismiss, grants City Defendants summary judgment on the due process claim, and remands Plaintiffs' remaining claims to New York State Supreme Court.

Dated: New York, New York
       January 17, 2012

SO ORDERED

_____
PAUL A. CROTTY
United States District Judge

---

[16] Article 78's four-month limitations period bars Plaintiffs' challenges to HPD's rent calculations for recertification periods prior to 2012. CPLR § 217(1).